FILED

United States District Court
Northern District of Alabama
Southern Division



02 DEC -5 AM 10: 46
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ALICE H. CHURNOCK, | ] | |
| Plaintiff(s), | ] ] ] | |
| vs. | ] | CV-02-N-0006-S |
| VULCAN OUTDOORS, INC., | ] ] ] | |
| Defendant(s). | ] ] | |

Memorandum of Opinion

ENTERED
DEC 0 5 2002

### I. Introduction.

This case involves claims arising out of the plaintiff's discharge from her employment with the defendant, Vulcan Outdoors, Inc. ("Vulcan"). Plaintiff Alice H. Churnock ("Ms. Churnock") alleges that she was a victim of discrimination on the basis of her religion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, and that Vulcan breached its employment contract with her when it discharged her. The court has for consideration the defendant's motion for summary judgment, filed on September 25, 2002. [Doc. # 29.] The issues have been briefed by both parties and are now ripe for decision. Upon due consideration, the motion will be granted in all respects.



## II. Facts.[1]

At all times relevant to this lawsuit, Vulcan was a publication company that published a wide variety of outdoor magazines, including Bow Master, Cabela's, CVA Black Powder, Hunt Club, Knight & Hale, Mossy Oak's Hunting the Country, Southern Sporting Journal, Whitetail Journal, and Varmint Masters. Until February 2002, Vulcan was a subsidiary of Vulcan Publications, Inc. ("VP"). At all relevant times, Eddie Lee Rider ("Mr. Rider") was the Editor-in-Chief and Executive Vice President of Vulcan, and Barry Lovette ("Mr. Lovette") was the Circulation Director for VP and spent some of his time involved in circulation matters for Vulcan.

Vulcan hired Ms. Churnock on September 7, 2000, as a marketing assistant. Ms. Churnock's job at Vulcan was her first job upon graduating from Auburn University, as well as her first job in the publishing industry. When she began her employment at Vulcan, Ms. Churnock was presented with a copy of the company's Employee Handbook ("the handbook"). A representative from the human resources department, Jennifer Noel ("Ms. Noel") reviewed the handbook with Ms. Churnock. The first page of the handbook states that it "represents the personnel policies" of Vulcan and that Vulcan "retain[s] the absolute right to modify or alter these policies." (Churnock Dep., Ex. 3, at 1.) Furthermore, that page includes the following statement: "These policies are only guidelines. They do not represent an employment contract and you should not treat them as such. . . . They may be

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

changed with or without notice." (*Id.*) It goes on to state that Vulcan "makes no guarantee of length of employment or advancement. Further[,] we expect both length and advancement will be impacted by your adherence to the standards of performance and conduct contained in this handbook." (*Id.*) Ms. Churnock signed an Employee Handbook Acknowledgment form on September 11, 2000, which stated:

> I understand and agree nothing contained in the Employee Handbook, employment application, or any other Company rule, regulation, policy or practice should be interpreted or construed as conferring employment for a specific term or as an employment contract. I further understand that the Company and I both have a right to discontinue the employment relationship at any time and for any reason.

(Churnock Dep., Ex. 4.) The handbook also contains a confidentiality policy, which states that employees "should never discuss proprietary information with any person from outside the company or with other company employees in any public place where it is possible you could be overheard." (Churnock Dep., Ex. 3, at 23.)

On April 12, 2001, Ms. Churnock was promoted to the position of marketing manager. Ms. Churnock's job duties included overseeing the design and use of subscription cards to be placed in Vulcan's publications, planning and attending trade shows, and attending and planning a variety of community relations activities. In conjunction with her participation in trade shows, Ms. Churnock provided prospective advertisers with subscription numbers for Vulcan's various publications. On these occasions, Ms. Churnock would provide the prospective advertisers with numbers she had verbally received from Mr. Rider. It was Ms. Churnock's understanding that the numbers she was providing prospective advertisers represented the number of paid subscriptions to the various magazines, as opposed to the

3

magazines' total circulation or total number of magazines printed. Despite the fact that she provided prospective advertisers subscription numbers at trade shows, Ms. Churnock admits that she was not directly involved in sales or advertising for Vulcan.

On Monday, June 25, 2001, Ms. Churnock was asked to fill out a form for List Locators and Managers ("List Locators"), a company that purchased and marketed Vulcan's subscriber lists. In order to fill out this form, Ms. Churnock was required to list the number of subscription records on file at the time the form was completed.[2] Ms. Churnock received a hand-written list of numbers to be used in completing the List Locators form from Mr. Lovette. Ms. Churnock noticed that the numbers given to her by Mr. Lovette did not correspond with the numbers she provided to prospective advertisers at the trade shows. For example, whereas Ms. Churnock had been telling prospective advertisers that the subscription numbers for Bow Master were 70,000 to 80,000, the list provided by Mr. Lovette indicated that Bow Master had 45,970 subscriptions in the database. Not all of the numbers provided by Mr. Lovette were lower than the numbers represented by Ms. Churnock; for instance, whereas Ms. Churnock told prospective advertisers that Southern Sporting Journal had 5,000 to 10,000 subscribers, Mr. Lovette's note indicated that there were 7,048 subscriptions to Southern Sporting Journal in the database. Ms. Churnock surmised from the discrepancy between the numbers she provided prospective advertisers

---

[2] There is some dispute as to what, exactly, the numbers Ms. Churnock was given to complete the List Locators form represented. While Ms. Churnock understood the numbers to represent the number of actual subscribers on the date the form was completed, Mr. Lovette has confirmed that the numbers Ms. Churnock used in completing the List Locators form represented the total number of active and expired subscriptions in the subscription database at the moment the query was run. The court is inclined to accept Mr. Lovette's explanation of the numbers, based on his familiarity with the practices in the publishing industry, over Ms. Churnock's understanding of what the numbers represented.

and the numbers she was given to submit to List Locators that Vulcan was falsifying its subscriber numbers to advertisers. That evening, Ms. Churnock prepared a letter of resignation that she planned to sign, date, and present to Vulcan if she was "asked again to reveal faulty information." (Churnock Dep., Ex. 2, at 2.)

Over the next two days, Ms. Churnock attempted to verify her suspicions regarding the discrepancies in the subscription numbers by speaking with several salespeople regarding the number of subscriptions they reported to prospective advertisers. Additionally, on June 27, 2001, Ms. Churnock contacted the fulfillment manager, Ted Hannah ("Mr. Hannah").[3] Mr. Hannah confirmed Ms. Churnock's suspicions that the subscription numbers she had been providing prospective advertisers were inflated so that Vulcan could sell advertisements at higher rates. Ms. Churnock also recalls an occasion, early in her employment with Vulcan, on which Mr. Hannah inadvertently provided her with a copy of a report that contained "the actual subscriber numbers." (Churnock Dep. at 98.) At the time she was given that report, Ms. Churnock was unsure of what it was, so she approached Mr. Rider with the document, whereupon Mr. Rider "ripped [the report] out of [Ms. Churnock's] hand" (Churnock Dep. at 94) and told her she did not need to see that report.

On June 28, 2001, Ms. Churnock spoke with Mr. Lovette, and she claims he admitted Vulcan had been falsifying the numbers they provided to prospective advertisers and that "it was an ethical dilemma for him as well." (Churnock Dep., Ex. 2, at 4.) Mr. Lovette told Ms. Churnock that "you in life always answer to someone, and here we answer to Doug

---

[3] It is the court's understanding that Mr. Hannah's job involved supervising the input of subscription data into a computer program that generated invoices and renewals for paid subscribers.

Moore [the president of Vulcan]" (Lovette Dep. at 41), to which Ms. Churnock responded that she doesn't answer to Doug Moore; she answers to God (*Id.*; Churnock Dep., Ex. 2, at 4). Mr. Lovette offered to distribute the subscriber numbers if Ms. Churnock was uncomfortable doing so. Mr. Lovette told Ms. Churnock that he would speak to Mr. Rider about her concerns.

That afternoon, Mr. Rider called Ms. Churnock into his office and, according to Ms. Churnock, "admitted everything, yes, we do falsify our numbers." (Churnock Dep. at 104.) Mr. Rider informed Ms. Churnock that it is a common practice in the publishing industry to exaggerate subscription numbers to prospective advertisers. Mr. Rider told Ms. Churnock that hers was a "moral decision" that only she could make, "but that he needed to know that [she] was '110% comfortable with [her] job requirements and that [she] could keep [her] mouth totally shut.'" (Churnock Dep., Ex. 2, at 5.) Ms. Churnock claims that she mentioned her religious convictions about lying in this meeting with Mr. Rider. (Churnock Dep. at 104.)

The following morning, June 29, 2001, Ms. Churnock approached Mr. Rider and told him that she had been thinking and praying about the situation, and she had decided that she could not lie for the company any longer because it was against her religion to lie. She issued an ultimatum to Mr. Rider: either he would contact each of Vulcan's advertisers to inform them of the actual subscription numbers and refund any amount they were overcharged for their advertising space, and he would ensure that each salesperson was informed of the actual numbers of subscriptions; or Ms. Churnock would do so. Mr. Rider indicated that he would think about her ultimatum, whereupon Ms. Churnock left for lunch. When she returned from lunch, her computer monitor had been turned off and her hard

6

drive had been removed from her office. When Mr. Rider returned from lunch, he called Ms. Churnock into his office for a meeting. Present at the meeting were Mr. Lovette and Ms. Noel. At that meeting, Ms. Churnock was terminated for threatening to breach the confidentiality policy contained in the Employee Handbook. Ms. Churnock, Mr. Lovette, and former Vulcan employee A. E. Walsh[4] agree that subscription numbers are generally not considered confidential information in the publishing industry.

Ms. Churnock filed a charge of discrimination against Vulcan with the EEOC on September 21, 2001, alleging religious discrimination. Ms. Churnock filed this lawsuit on December 4, 2001, in the Circuit Court of Jefferson County, and Vulcan removed the case to this court on January 2, 2002. [Doc. # 1, Notice of Removal.] The instant motion for summary judgment was filed on September 25, 2002. [Doc. # 29.]

### III.   Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the

---

[4] Also before the court at this time is a motion by the defendant to strike the declaration of A. E. Walsh on the grounds that it contains inadmissible hearsay, inadmissible opinion testimony, and inadmissible anecdotal evidence. [Doc. # 46.] The court agrees that some of the information contained in the declaration would be inadmissible at trial; however, the court is of the opinion that the portions of the declaration relating to the applicability of the confidentiality agreement to subscription numbers would be admissible at trial. Therefore, the court will consider only those portions of the declaration it considers admissible in reaching its decision on Vulcan's motion for summary judgment.

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

**IV.     Discussion.**

**A.     Ms. Churnock's breach of contract claim.**

Ms. Churnock's breach of contract claim is based on "assurances that were made to [her] in her employment handbook." [Doc. # 38, at 23.] Specifically, Ms. Churnock alleges that Vulcan failed to abide by its own policies relating to religious discrimination, ethical standards that were expected of Vulcan and its employees, and the disciplinary scheme contained in the handbook.

8

"The bedrock principle of Alabama employment law is that, in the absence of a contract providing otherwise, employment in [Alabama] is at-will, terminable at the will of either party. Under this doctrine, an employee may be discharged for any reason, good or bad, or even for no reason at all." *Ex parte Amoco Fabrics & Fibers Co.*, 729 So. 2d 336, 339 (Ala. 1998). There is an exception to this rule for implied contracts arising out of the use of an employee handbook. *See Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725 (Ala. 1987). For a handbook to constitute an implied contract of employment, the language in the handbook must be sufficiently specific to constitute an offer; the offer must have been communicated to the employee; and the employee must have accepted the offer by accepting or retaining employment after he has become generally aware of the offer. *Hoffman-La Roche*, 512 So. 2d at 735. However, Alabama courts will generally *not* imply an employment contract where the employer includes in the handbook an explicit disclaimer stating that no part of the handbook constitutes a binding contract. *See Amoco Fabrics*, 729 So. 2d at 340; *Abney v. Baptist Med. Ctrs.*, 597 So. 2d 682, 683 (Ala. 1992); *Hanson v. New Tech., Inc.*, 594 So. 2d 96, 99 (Ala. 1992). In *Hanson*, the Alabama Supreme Court held as a matter of law that a handbook containing a disclaimer could not reasonably be construed to constitute a unilateral contract of employment. *Hanson*, 594 So. 2d at 99. *See also Ledbetter v. United Ins. Co. of Am.*, 837 F. Supp. 381 (M.D. Ala. 1993), *aff'd*, 59 F.3d 1247 (11th Cir. 1995); *Sisk v. Marriott's Grand Hotel*, No. 92-0498-AH, 1993 U.S. Dist. Lexis 5312 (S.D. Ala. Apr. 12, 1993).

Because the handbook at issue in this case contained a clear and unequivocal statement that it "do[es] not represent an employment contract," and because Ms.

Churnock signed an acknowledgment stating that the handbook should not be "interpreted or construed as conferring employment for a specific term or as an employment contract," the court finds as a matter of law that the handbook could not reasonably be construed to constitute a unilateral contract of employment. Summary judgment as to Ms. Churnock's breach of contract claim is therefore due to be granted.

### B.    Ms. Churnock's Title VII claims.

Ms. Churnock claims that Vulcan discriminated against her because of her religious beliefs. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, prohibits discrimination with respect to the terms and conditions of employment on the basis of an employee's religion. 42 U.S.C. § 2000e-2(a)(1). Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Based on this statutory language, courts have interpreted Title VII to provide two separate species of religious discrimination claims: disparate treatment claims, and failure to accommodate claims. *See Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301 (11th Cir. 2002) (disparate treatment); *Beadle v. Hillsborough County Sheriff's Dep't*, 29 F.3d 589 (11th Cir. 1994) (failure to accommodate). As Ms. Churnock has raised both species of religious discrimination claims, the court will address each theory in turn.

### 1.    Disparate treatment.

To succeed on her disparate treatment claim, Ms. Churnock must show that she was treated differently than were other employees because of her religious beliefs. *Int'l Bhd. of*

10

*Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). "When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait [here, religion] actually motivated the employer's decision.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). Because Ms. Churnock presents no direct evidence of discriminatory intent, she must establish discriminatory intent utilizing the familiar burden-shifting scheme of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Ms. Churnock must first establish a *prima facie* case of intentional discrimination by showing: (1) she is a member of a particular religion or holds a particular religious belief; (2) she is qualified to perform the job at issue; (3) she has suffered some adverse employment action; and (4) someone outside the protected class of which she is a member was treated differently than her *or* her former position was filled by a person of a different religion or no religion at all. *See Wilshin v. Allstate Ins. Co.*, 212 F. Supp. 2d 1360, 1371 (M.D. Ga. 2002); *Gunning v. Runyon*, 3 F. Supp. 2d 1423, 1428 (S.D. Fla. 1998); *Breech v. Ala. Power Co.*, 962 F. Supp. 1447, 1457 (S.D. Ala. 1997), *aff'd*, 140 F.3d 1043 (11th Cir. 1998).

If Ms. Churnock succeeds in establishing a *prima facie* case of religious disparate treatment discrimination, Vulcan must articulate a legitimate, nondiscriminatory reason for the adverse employment action, "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993). If Vulcan meets this burden of production, Ms. Churnock must show that Vulcan's proffered reasons are a pretext for unlawful discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

11

### a.   Ms. Churnock's *prima facie* case.

Following the above analysis, the court is satisfied that Ms. Churnock has established the first three elements of the *prima facie* case. Ms. Churnock is a Christian with a sincerely held religious belief that lying is wrong, there is no evidence to indicate that she was not qualified to do her job,[5] and she was terminated.

With respect to the fourth element, Ms. Churnock states that she "was in fact treated differently than the other employees at Vulcan Outdoors" insofar as she was asked to "continue to lie for the company" or risk her job security, while other employees of Vulcan were not given this choice. [Doc. # 38, at 12, 13.] However, Ms. Churnock has failed to produce evidence of someone outside the Christian religion who was treated differently than her. Had Ms. Churnock presented evidence of a non-Christian who engaged in the same conduct in which she engaged, i.e. threatening to contact advertisers and disclose subscription information to them, but was not terminated, then Ms. Churnock would have presented evidence supporting her argument that she was discriminated against *because of* her religion. Nor has Ms. Churnock alleged that her former position was filled by someone of a different religion or of no religion at all. Because Ms. Churnock has failed to produce any evidence of similarly situated, non-Christian employees who were treated less harshly than her, or that her former position at Vulcan was filled by a non-Christian, she has failed to establish a *prima facie* case of religious disparate treatment discrimination.

---

[5] In fact, the evidence suggests that Ms. Churnock was an excellent employee. When she was promoted on April 12, 2001, Mr. Rider indicated that she "ha[d] done a tremendous job in 7 months" and was "[v]ery committed." (Churnock Dep., Ex. 2.)

### b. Vulcan's legitimate, nondiscriminatory reason.

Even if Ms. Churnock had made her *prima facie* case, Vulcan has proffered a legitimate, nondiscriminatory reason for terminating her: she threatened to contact advertisers and give them information about subscription numbers that she was not authorized to distribute.[6] Vulcan's burden in producing a legitimate, nondiscriminatory reason for terminating Ms. Churnock is a light one. Indeed, it is well settled that "a defendant may terminate an employee for a good or bad reason without violating federal law." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). The federal courts "do not second-guess the business judgment of employers," *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997)), nor are courts "in the business of adjudging whether employment decisions are prudent or fair," *Damon*, 196 F.3d at 1361. The court's only concern is whether unlawful discrimination motivated Vulcan's decision to terminate Ms. Churnock. *See id.*

The court is of the opinion that Vulcan's proffered reason suffices to satisfy its intermediate burden of production. Ms. Churnock claims she was motivated by her

---

[6] Vulcan has classified its reason for terminating Ms. Churnock's employment as her threats to "divulge, without permission, information that Vulcan Outdoors deemed confidential" pursuant to the confidentiality policy contained in the handbook. [Doc. # 45, at 11.] The confidentiality policy prohibits the disclosure of proprietary information. Proprietary information is information that is "exclusively owned; private." The American Heritage Dictionary of the English Language (4th ed. 2000). The court need not, and therefore does not, decide whether the information sought to be disclosed by Ms. Churnock was proprietary such that it falls within the purview of the confidentiality policy. It is sufficient that Vulcan has stated that it terminated Ms. Churnock because she threatened to disclose information that it deemed confidential. *Cf. Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002) ("A plaintiff . . . does not succeed [in discounting the legitimacy of a defendant's proffered reasons for an adverse employment action] by presenting evidence that the defendant was mistaken about the facts upon which [it] based [its] alleged non-discriminatory decision. Instead, a plaintiff must present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which [it] allegedly based [its] non-discriminatory reason.").

13

religious beliefs when she threatened to disclose subscription numbers to advertisers; thus, she argues, her termination was *based on* her religion. However, religious motivation for conduct an employer perceives as detrimental to its business cannot convert an otherwise nondiscriminatory reason for an adverse employment action into a decision *based on* religion. *See, e.g., Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996) (holding the employer's proffered reasons for discharging the plaintiff – that she sent letters to her co-employees that criticized their personal lives and beliefs, offended them, and damaged her working relationships – were legitimate and nondiscriminatory reasons where the plaintiff was motivated to send the letters by her religious beliefs), *cert. denied*, 522 U.S. 813 (1997); *Wilshin*, 212 F. Supp. 2d at 1372 (holding that the employer's articulated reason for terminating the plaintiff – that he violated company policy by failing to keep his office open on the weekends – was legitimate and nondiscriminatory where the reason the plaintiff failed to keep his office open on the weekends was that his religion prohibited him from working on the Sabbath). Assuming Ms. Churnock has met her *prima facie* case (although the court has found that she has not), Vulcan has articulated a legitimate, nondiscriminatory reason for terminating Ms. Churnock. Therefore, she must establish a genuine issue of material fact as to whether Vulcan's articulated reason is mere pretext for discrimination.

      **c.**    **Pretext.**

In support of her argument that Vulcan's articulated reasons are mere pretext for religious discrimination, Ms. Churnock asserts only that the information that she sought to disseminate was not, in fact, confidential. However, the court is of the opinion that the

14

question of whether the information was, in fact, confidential is of no moment to a determination of whether Vulcan acted with discriminatory animus. While "[a] showing that a defendant has lied about the reasons for his acts . . . can be strong evidence that a defendant has acted with discriminatory intent," a plaintiff cannot prove pretext "by presenting evidence that the defendant was mistaken about the facts upon which [it] based [its] alleged non-discriminatory decision. Instead, a plaintiff must present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which [it] allegedly based [its] non-discriminatory decision." *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002). Ms. Churnock has presented no evidence from which a reasonable jury could find that Vulcan did not honestly believe that she threatened to disclose information it deemed confidential. Therefore, even if she had made her *prima facie* case, summary judgment is due to be granted on her disparate treatment religious discrimination claim.

    2.    **Failure to accommodate.**

Ms. Churnock can establish a *prima facie* case of religious discrimination resulting from Vulcan's failure to make a reasonable accommodation by showing that: (1) she had a bona fide belief that compliance with an employment requirement would be contrary to her religious belief or practice; (2) she informed Vulcan of the conflict; and (3) she was discharged for failing to comply with the conflicting employment requirement. *Beadle v. City of Tampa*, 42 F.3d 633, 636 n.4 (11th Cir. 1995). If Ms. Churnock establishes a *prima facie* case, the burden shifts to Vulcan to show either that (1) it offered to or did reasonably accommodate Ms. Churnock's religious needs; or (2) it could not reasonably accommodate

Ms. Churnock's religious needs without undue hardship. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986); *Beadle v. Hillsborough County Sherrif's Dep't*, 29 F.3d 589, 592 (11th Cir. 1994). An undue hardship is anything that requires more than a *de minimis* cost. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). Moreover, the Supreme Court has recognized that the phrase "*de minimis* cost" involves not only monetary concerns, but also the employer's burden in conducting business. *Hardison*, 432 U.S. at 84. Because Title VII does not define the terms "reasonably accommodate" and "undue hardship," "the precise reach of the employer's obligation to [provide a reasonable accommodation to] its employee . . . must be determined on a case-by-case basis." *Hillsborough County Sheriff's Dep't*, 29 F.3d at 592.

The court is satisfied that Ms. Churnock has adduced sufficient evidence to establish her *prima facie* case.[7] Ms. Churnock believed that compliance with the employment requirement that she be "110% comfortable" with "keep[ing her] mouth totally shut," (Churnock Dep., Ex. 2, at 5) conflicted with her religious belief against lying. Furthermore, she notified Mr. Rider and Mr. Lovette of her moral objection to "keep[ing her] mouth totally shut." (*Id.*) Ms. Churnock was then discharged for failing to comply with the objectionable employment requirement.

Thus, to prevail on its motion for summary judgment, Vulcan must show that there is no triable issue of fact as to whether either Vulcan offered a reasonable accommodation to Ms. Churnock, or Ms. Churnock's beliefs could not be reasonably accommodated

---

[7] Indeed, Vulcan does not argue that Ms. Churnock fails to make a *prima facie* case, but rather focuses its argument on the issue of whether a reasonable accommodation could be provided that would involve no more than a *de minimis* cost.

16

without undue hardship. Vulcan seeks to establish the latter; it asserts that the plaintiff's beliefs are not of the type that can be reasonably accommodated without undue hardship. Ms. Churnock has suggested that a reasonable accommodation could have been afforded her by Vulcan "simply [doing] business properly and not [lying] and misrepresent[ing] facts to [its] advertisers." [Doc. # 38, at 19.] Specifically, Ms. Churnock asked Vulcan to accommodate her religious beliefs "by informing any advertisers to whom she had misrepresented facts, or by allowing her to do the same." [*Id.*] Vulcan argues that the undisputed evidence indicates that if Ms. Churnock had been permitted to contact the advertisers in the way she proposed, "it would have caused the company substantial hardship and jeopardized Vulcan['s] relationship with its advertisers." [Doc. #45, at 18.] (Rider Aff. ¶¶ 8-9; Lovette Aff. ¶ 10.) While it may disagree with the questionable business practices in which it appears Vulcan engaged, the court is of the opinion that Ms. Churnock's conduct "is not the type that an employer can possibly accommodate." *Chalmers*, 101 F.3d at 1021. The court is certain that having an employee telephone all of its advertisers and inform them that they had been lied to would seriously damage Vulcan's business interests. This is especially true given that there is a real dispute between the parties as to whether Vulcan had, in fact, been inflating its subscription numbers to advertisers or prospective advertisers.[8] *See Wisner v. Truck Cent.*, 784 F.2d 1571, 1573 (11th Cir. 1986) ("[An employee's] suggestions [are] not reasonable accommodations [if]

---

[8] Without providing a legitimate explanation for the discrepancy between the numbers Ms. Churnock gave prospective advertisers at trade shows and the numbers she was given to complete the List Locators form, Vulcan has consistently disputed the allegations that it falsified its subscription numbers. [Doc. # 45.] Further, Vulcan asserts, and the court agrees, that whether the numbers were, in fact, falsified or not is immaterial to Ms. Churnock's claims in this lawsuit.

they are inconsistent with the legitimate objectives that the defendant sought to accomplish."). "It is undue hardship in spades when the necessary accommodation would strike a body blow to the employer's business." *Rodriguez v. City of Chicago*, 156 F.3d 771, 779 (7th Cir. 1998) (Posner, J., concurring).

Additionally, the court notes that Ms. Churnock's ultimatum made it exceedingly difficult for Vulcan to attempt to accommodate her religious beliefs. The Eleventh Circuit "recognize[s] an employee's duty to make a good faith attempt to accommodate [her] religious needs." *Hillsborough County*, 29 F.3d at 593. *See also Chrysler Corp. v. Mann*, 561 F.2d 1282, 1295 (8th Cir. 1977) ("An employee cannot shirk [her] duties to try to accommodate [her]self or to cooperate with [her] employer in reaching an accommodation by mere recalcitrant citation of religious precepts."), *cert. denied*, 434 U.S. 1039 (1978). Ms. Churnock's issuance of an ultimatum hardly evidenced a willingness to cooperate with Vulcan in accommodating her religious beliefs. The court concludes that Ms. Churnock left Vulcan with little opportunity to reasonably accommodate her, and that any potentially appropriate accommodations would have required more than a *de minimis* cost. Therefore, as a matter of law, Ms. Churnock cannot succeed on her failure to accommodate claim.

## V. **Conclusion.**

For the foregoing reasons, the court finds that Ms. Churnock has failed to adduce sufficient evidence to enable a reasonable jury to find in her favor on her claims for breach of contract and religious discrimination. Vulcan's motion for summary judgment will therefore be granted in all respects. It must be clearly understood, however, that the court takes no position whatsoever with regard to the alleged business practices of the

defendant. The court is saying only that, viewing the evidence in the light most favorable to Ms. Churnock, no reasonable jury could find that religious discrimination occurred in this case. Title VII was not enacted to remedy fraudulent business practices, no matter how loathsome the court may find them. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 4th of December, 2002.

Edwin Nelson
United States District Judge